People v Sparks (2024 NY Slip Op 04488)

People v Sparks

2024 NY Slip Op 04488

Decided on September 19, 2024

Appellate Division, First Department

Gesmer, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: September 19, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Troy K. Webber
Ellen Gesmer Manuel Mendez LlinÉt M. Rosado Marsha D. Michael

Index No. 4231/19 Appeal No. 2505 Case No. 2022-01821 

[*1]The People of the State of New York, Respondent,
v
Yusuf Sparks, Defendant-Appellant.

Defendant appeals from a judgment of the Supreme Court, New York County (Neil Ross, J. at plea and sentence), rendered April 14, 2022, convicting defendant, upon his plea of guilty, of robbery in the third degree, and sentencing him, as a second felony offender, to an indeterminate sentence of 3 to 6 years.

Jenay Nurse Guilford, Center for Appellate Litigation, New York (Leanna J. Duncan of counsel), for appellant.
Alvin L. Bragg, Jr., District Attorney, New York (Jamie Masten of counsel), for respondent.

Gesmer, J. 

This Court has "broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range" (People v Delgado, 80 NY2d 780, 783 [1992], citing CPL 470.15 [6] [b]). The Court of Appeals has explained that "[t]he law and strong public policy of this State mandate that the court, detached from outside pressures often brought to bear on the prosecution and defense" is uniquely situated to "perform the delicate balancing necessary to accommodate the public and private interests represented in the criminal process" (People v Farrar, 52 NY2d 302, 306 [1981]). Therefore, not only can this court impose a lesser penalty even where the parties have negotiated a plea agreement, it should do so "when the facts and justice so require" (id.). In exercising its discretion, this Court must consider "the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence" (id. at 305). Applying this standard, we hold that further incarceration is unduly punitive and counter to the interests of justice. In light of Mr. Sparks' mental illness and the abuse he suffered in prison, we reduce his sentence to the minimum, two to four years of incarceration (Penal Law § 70.06 [4][b]).
Mr. Sparks is now 30 years old. In his brief life, he has been diagnosed with 14 psychiatric disorders, most of which fall within the psychotic spectrum; prescribed at least 10 psychotropic medicines; and shuffled between more than 21 psychiatric and prison facilities. He has spent all but two months of his adult life incarcerated and a total of three and a half years in solitary confinement. His prison records show that he has been injured in multiple altercations with other inmates and prison staff and he has initiated numerous suicide attempts.
In 2019, following release from his last period of incarceration, Mr. Sparks tried and failed to receive help and treatment. On or about December 21, 2019, immediately after his release, Mr. Sparks met with his former attorney, Andrew Dalack, who found Mr. Sparks to be showing signs of a severe mental break. Mr. Dalack then escorted Mr. Sparks to Presbyterian Medical Center. The hospital, however, turned Mr. Sparks away. Mr. Dalack then contacted defendant's parole officer, but "[h]e didn't offer to help or seem concerned," although [*2]he later said that Mr. Sparks was "in dire straits and stressed out." On December 24, 2019, Mr. Sparks called Mr. Dalack again, expressing delusions that he was being followed and that someone wanted to kill him. Mr. Dalack took Mr. Sparks to Bellevue Medical Center which refused to admit him. Mr. Dalack then arranged for Mr. Sparks to be taken to NYU Langone. Mr. Sparks was allowed to sleep on a gurney for a while at that hospital but was then denied admission for a third time.
By then, Mr. Sparks was in the midst of a psychotic delusion, according to the forensic psychologist's report. He wandered the streets. At approximately 3:00 p.m., he followed a stranger into an apartment building. According to the psychologist's evaluation, Mr. Sparks believed that the victim was "sending him signs and communicating with him in some unspoken matter" and that the Star of David necklace worn by the victim "was a symbol of ISIS, an evil threat to him and to this country that he had to destroy." Mr. Sparks cornered the victim and wrested the necklace from his neck.[FN1] The victim stated later in an interview with an investigator that he believed Mr. Sparks's "body was not cooperating," and that there was a "disconnect" in how he conducted himself.
After Mr. Sparks was arrested, two doctors found that he was incompetent to stand trial. Neither doctor found him to be malingering. Defense counsel arranged for Mr. Sparks to be examined by forensic psychologist Alan Goldstein, Ph.D. Dr. Goldstein, who interviewed Mr. Sparks remotely for approximately six hours, reviewed over 3600 pages of records concerning Mr. Sparks, viewed videos of the incident, and interviewed his attorney, his prior attorney and an investigator who had interviewed the victim of the crime and his father. Dr. Goldstein produced a detailed 25-page report in which he opined that Mr. Sparks was "not malingering symptoms of mental illness for secondary gain," and that his "symptoms are exacerbated by his long history of isolation and his treatment by some correctional officers." He further concluded that, at the time of the offense, Mr. Sparks was "genuinely psychotic," in the midst of a "delusional state," and "was unable to recognize the nature of his act as well as its wrongfulness."
On March 21, 2022, after more than two years in pretrial confinement, Mr. Sparks pleaded guilty to third degree robbery. On April 14, 2022, Mr. Sparks appeared for sentencing. He stood before Hon. Neil Ross, requested an adjournment, and detailed his most recent suicide attempt, stating "[t]hey had to cut me down" and that he "got kidnapped to go back to Rikers Island." He also asserted that he was not sure whether he was in the "right state of mind" during his plea and said "I don't know a Sparks. I don't know my name." Despite these illogical and bizarre statements, Judge Ross moved forward with Mr. Sparks' arraignment and sentencing. Mr. Sparks then displayed an "enormous amount of anxiety" that was so severe[*3], in the words of his defense attorney, that Mr. Sparks left the courtroom. Judge Ross then discussed the history of the case, including the lengthy psychological evaluation by Dr. Goldstein. The dissent notes, as a basis for rejecting defendant's application for a plea reduction, that Judge Ross considered the forensic psychologist's report in his sentencing. However, although Judge Ross referred to the report, he rejected one of its primary conclusions when he determined that Mr. Sparks was not having a psychotic crisis but was "malingering" to avoid getting sentenced. Judge Ross then sentenced defendant in absentia to 3 to 6 years in prison.
In this case, continued incarceration of Mr. Sparks serves none of the objectives of criminal punishment. In order to best protect the public, Mr. Sparks must get appropriate mental health treatment to rehabilitate him to a healthier mental state. His 12 years of imprisonment has only served to exacerbate his mental difficulties. There is no reason to believe that further incarceration will rehabilitate him, and the record clearly demonstrates that Mr. Sparks needs rehabilitation, not punitive incarceration.
Treating incarceration as the default response for individuals like Mr. Sparks has outsized deleterious consequences that, ultimately, make our communities less safe. As Chief Justice Wilson noted in his concurring opinion in People v Greene, "the cycle of incarceration further destabilizes these individuals; mental health treatment in prison is costlier than community-based treatment; individuals with mental illness are at greater risk of detention in prison and extended incarceration; prison mental health resources are often inadequate; and individuals living with mental illness face greater risk of harm and abuse while behind bars" (41 NY3d 950, 954 [2024] [Wilson, J. concurring]). While Greene involved a nonserious crime, the principle remains: default incarceration for crimes caused by mental illness is antithetical to the interests of our penal system. Deterrence cannot be accomplished for a person who was delusional at the time of a crime; and punishment for a person operating under delusions is not just.
Even in a case involving a violent assault (which is distinguished from the instant case) with a weapon that resulted in serious injuries to the victim, this Court has held that a lengthy prison term for a person "suffering from such severe mental illness that his capacity to form the required element of intent for the subject crime is questionable at best. . . is unduly harsh" (People v Reyes, 89 AD3d 401, 403 [1st Dept 2011]).
Further incarceration is plainly not the answer for Mr. Sparks. Forensic psychologist Dr. Goldstein explained that "[b]ased on Mr. Sparks' chaotic childhood history, the fact that he has spent half his life incarcerated, the long periods of continuous time he has remained in isolation, and what he has described regarding his treatment by some correctional officers[*4], Mr. Sparks is an emotionally fragile, damaged individual." He went on to point out that the prison system is ill-equipped for dealing with him and noted that Mr. Sparks' numerous intra-institutional transfers "[p]erhaps. . . reflect an attempt to relocate a potential source of difficulty, a potential problem for another facility to address." The dissent fails to refute Dr. Goldstein's analysis or explain how further incarceration would serve the goals of societal protection, deterrence or rehabilitation. Therefore, further incarceration of Mr. Sparks does not serve the best interests of the public or the justice system.
Accordingly, the judgment of the Supreme Court, New York County (Neil Ross, J. at plea and sentence), rendered April 14, 2022, convicting defendant, upon his plea of guilty, of robbery in the third degree, and sentencing him, as a second felony offender, to an indeterminate sentence of 3 to 6 years should be modified, as a matter of discretion in the interest of justice, to reduce the sentence to 2 to 4 years, and otherwise affirmed.
All concur except Webber J.P. and Michael J. who dissent
in a separate Opinion by Webber, J.P.
Webber, J.P. (dissenting),
I respectfully dissent as I do not believe defendant's sentence was excessive or unduly harsh, warranting a sentence reduction.
By indictment, defendant was charged with burglary in the first degree (Penal Law § 140.30[2]), one count of burglary in the second degree (Penal Law § 140.25[2]), and one count of robbery in the third degree (Penal Law § 160.05).
On Christmas Day 2019, defendant followed the complainant into his apartment building at 155 East 38th Street in Manhattan. After cornering him inside the building's elevator, defendant pushed the complainant against the wall and wrested a chain bearing the Star of David from around his neck. When the elevator stopped at the complainant's floor, the complainant exited and screamed for his father. Defendant followed him down the hallway to his apartment. At the doorway of the apartment, defendant pushed at least half of his body inside the apartment, as the complainant and his father tried to keep defendant out. As a result of the struggle, the complainant sustained substantial bruising and pain to his arm, knee, and leg. Defendant threw the chain he had ripped from the complainant's neck on the floor of the apartment before fleeing the building. Defendant then hailed a taxi. When he could not give the driver a destination, the driver called the police. Defendant was arrested shortly thereafter.
On March 21, 2022, following extensive negotiations and discussions, defendant appeared with counsel and entered a plea of guilty to robbery in the third degree with a promised sentence of 3 to 6 years incarceration. According to the record, the People informed the court that they were extending the plea offer in light of defendant's "acceptance of responsibility, the relative lack of actual injury, and [the] mitigation provided [*5]by a psych expert." It was noted that were defendant convicted of the first or second count of the indictment—first or second-degree burglary—he would be a mandatory persistent violent felony offender, which would require the imposition of a mandatory life sentence. The plea offer would allow defendant to plead guilty to a nonviolent offense, third-degree robbery, that would not trigger mandatory persistent offender status. The People represented that they would not seek to adjudicate defendant a discretionary persistent felony offender.[FN2]
Defendant fully allocuted to the crime charged. In response to the court's inquiries, defendant stated that he was pleading guilty of his own free will because he was, in fact, guilty; that he had ample time to speak with his attorney and was satisfied with her representation; that he was not on any medications, drugs, or alcohol that would impair his ability to understand what was happening; that he felt that he understood everything that had been said so far; that he was "proceeding today" with a "clear mind"; and that no one was forcing him to take the plea. The court then informed defendant of his trial rights, including that he was giving up the right to remain silent; the right to a trial; the right to confront witnesses against him and to contest any search or seizure. Defendant told the court that he understood that he was giving up those rights. He further confirmed that he discussed with counsel possible defenses he could have raised were he to proceed to trial. Defendant affirmed that no other promises had been made to him to induce his guilty plea. Defendant was also made aware of the potential immigration consequences of his guilty plea.
The court explained that as part of the plea agreement, defendant would be sentenced only as a second felony offender—rather than a persistent violent felony offender—despite the fact he had two prior violent felony convictions. The court further advised that, had the People not dismissed the top two counts, and defendant been convicted of either of those violent felonies at trial, defendant's sentence would have been "extraordinarily severe," resulting in the "potential of a life sentence." Defendant indicated that he understood.
Defendant then admitted that, on December 25, 2019, inside 155 East 38th
Street, he "forcibly stole property from an individual." Defendant confirmed that he had "followed someone" into the building, had "used force to steal property from that
person," and had "push[ed] that person against the wall to use force, and then stole the
property from them." Defendant's plea was clearly knowing and voluntary. Contrary to the assertions by the majority, there is nothing in the record to suggest that defendant was under any type of psychotic delusion at the time of the incident. The court specifically explored whether possible defenses had been discussed and rejected. There was no statement made by counsel that any viable psychiatric defense existed[*6]. Certainly, if one existed, it would have been explored and discussed during the multiple years of plea negotiations.
On April 14, 2022, the court imposed the promised negotiated sentence of 3 to 6
years incarceration.[FN3]
This Court is empowered to reduce a sentence "as a matter of discretion in the
interest of justice" upon a determination that the sentence, though lawful, is "unduly harsh or severe" (CPL 470.15 [6][b]; see People v Williams, 219 AD3d 409, 409 [1st Dept 2023]; People v Wiggins, 24 AD3d 263, 263 [1st Dept 2005]).
This was an extremely beneficial plea and sentence which was negotiated over a substantial period of time. The record is clear that defendant conferred with his counsel, fully comprehended and consented to the 3-to-6-year sentence. Defendant clearly understood the benefits of the plea and sentence. He received a sentence less than the maximum of 3 1/2 to 7 on the robbery and only slightly higher than the minimum of 2 to
4. Most importantly, defendant understood that by pleading guilty he was avoiding any possibility of serving a life sentence. The fact that defendant himself agreed to this sentence is one factor which supports the conclusion that it is not harsh or excessive (see People v Ba, 39 NY3d 1130, 1136-1137 [2023] [Troutman, J. concurring]).
Although this Court is not required to defer to the determination of the sentencing judge, the sentencing judge is generally "recognized to be in a superior position to dispense proportionate and fair punishment" (People v Day, 73 NY2d 208, 212 [1989]; see also People v Garcia, 195 AD2d 253, 254-255 [1st Dept 1993], affd 84 NY2d 336 [1994]). For that reason, the sentencing judge is "wisely allocated wide latitude" in fashioning sentences (Day, 73 NY2d at 212; see also People v Guilermo P., 184 AD3d 481, 481 [1st Dept 2020], lv denied 35 NY3d 1066 [2020] [noting that "(t)he sentencing court has broad discretion with regard to the imposition of a sentence"]). Here, in my opinion, defendant has failed to establish how the agreed upon sentence was unduly harsh or severe, thus justifying disregarding the sentencing court's reasoned determination.
Defendant and the majority argue that defendant's mental health issues, his traumatic childhood, the difficulties of being incarcerated while struggling with mental illness, his attempts at rehabilitation, and the failure of the criminal justice system to address his difficulties warrant a reduction in sentence. Defendant's history of mental illness is undisputed. Both the court and the People were well aware of defendant's mental health challenges and other difficulties. During extensive plea negotiations which took place for almost two years, defendant's counsel, who was a clinical psychologist with 10 years of practice in that field prior to becoming an attorney, submitted to the People and the court a 26-page psychological evaluation, which detailed defendant's mental health struggles, history of trauma, and extended periods of incarceration[*7]. Prior to defendant's plea, the People noted that the plea offer was made in light of the "mitigation provided by a psych expert." The court repeatedly acknowledged defendant's difficulties and at the time of sentencing requested that defendant be housed "at the medical facility for the Department of Corrections."
Thus, the record is clear that the factors which the majority and defendant point to, were fully discussed and considered by the sentencing court and the People prior to the fashioning of an appropriate plea and sentence (see e.g. People v Kemp, 160 AD2d 616, 617 [1st Dept 1990], lv denied 76 NY2d 790 [1990] [the defendant's "psychiatric history does not present a reason to reconsider the sentence imposed"]; People v Thompson, 33 AD3d 1131 [3d Dept 2006] [the court considered the "defendant's difficult life, including her many emotional and psychological problems as detailed in the report of the examining psychiatrist, in fashioning an appropriate sentence"]).
The majority's argument that the sentencing court somehow disregarded the report of the forensic psychologist as to defendant's mental status, since it questioned the report's conclusion that defendant was not having a psychotic crisis but was malingering to avoid the sentence, is without merit and contextually incorrect. This statement was made by the court at sentencing. It had no bearing on the considerations that went into the plea and sentence. The sentence that was imposed was exactly the same sentence that was bargained for and promised at the time of defendant's plea.
At bottom, the sentence imposed was appropriate given the facts and circumstances presented. As stated, defendant, who was six feet, seven inches and 209 lbs., followed the complainant, who was a stranger, into the elevator of his apartment building, pushed him up against the wall of the elevator, ripped his chain from his neck, chased the complainant to the complainant's apartment, and attempted to force his way inside the apartment while struggling with the complainant and the complainant's father. During the struggle, the complainant suffered physical injuries.
The majority's decision is a veiled attempt to somehow compensate for the past failures to address defendant's mental health and other challenges. Indeed, the majority states, "[t]he dissent fails to refute Dr. Goldstein's analysis or explain how further incarceration would serve the goals of societal protection, deterrence or rehabilitation." That, however, is not the determination to be made. The issue on appeal is whether the sentence imposed, for defendant's criminal actions on December 25, 2019, was excessive or unduly harsh. In my opinion, it was not. Rather, the sentence agreed upon and
imposed, fairly balanced defendant's background together with the interests of the complainant, the complainant's father, and members of the public at large.
Accordingly, I respectfully dissent.
Judgment, Supreme Court, New York County (Neil Ross, [*8]J. at plea and sentence), rendered April 14, 2022, modified, as a matter of discretion in the interest of justice, to reduce the sentence to 2 to 4 years, and otherwise affirmed.
Opinion by Gesmer, J. All concur except Webber, J.P. and Michael J.
who dissent in a separate Opinion by Webber, J.P.
Webber, J.P., Gesmer, Mendez, Rosado, Michael, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: September 19, 2024

Footnotes

Footnote 1: Mr. Sparks later threw the necklace to the ground. This supports the conclusion of the psychiatric evaluator that his grabbing of the chain was prompted by his delusion, not by a desire to steal for his own material gain.

Footnote 2: Defendant had previously been convicted of two violent felony offenses. In 2011, he was convicted of robbery in the second degree as a result of his forcibly taking a cell phone from an individual on the street and then threatening to shoot and kill the individual. In 2013, he was convicted of assault in the second degree for striking an individual over the head with a milk crate, knocking the victim unconscious and resulting in the victim sustaining a brain hemorrhage, nasal bone fracture, and orbital globe hemorrhage.

Footnote 3: At sentencing, defendant voluntarily walked out of the courtroom and into the corrections holding area. Counsel confirmed that defendant had left the courtroom voluntarily and consented to defendant be sentenced in absentia.